# United States Court of Appeals
## For the First Circuit

No. 11-1991

WANDA CORDERO-SUÁREZ,

Plaintiff, Appellant,

v.

ORLANDO RODRÍGUEZ; FABIAN SERRANO; JOSÉ J. FAS-QUIÑONES,

Defendants, Appellees,

ÁNGEL A. ORTIZ-GARCÍA; JUAN C. PUIG,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Thompson, Circuit Judges.

Israel Roldán González for appellant.
Luis R. Román-Negrón, Acting Solicitor General, and Susana
I. Peñagarícano-Brown, Assistant Solicitor General, for
appellees.

August 3, 2012

**THOMPSON**, **Circuit Judge**. Wanda Cordero-Suárez appeals a district judge's grant of summary judgment in favor of three defendants, each of whom she claims had some hand in discriminating against her at work because of her political affiliation. Although some of Cordero's allegations are unsettling, we nevertheless hold that summary judgment was appropriate because Cordero's suit was untimely. We therefore affirm.

Because this is an appeal from a summary-judgment grant, we sketch the facts as they appear on the record, viewed in the light most favorable to Cordero. See Galera v. Johanns, 612 F.3d 8, 10 n.2 (1st Cir. 2010). In 1996, Wanda Cordero began working as an agent in the Internal Revenue Division of the Puerto Rico Treasury Department. For some years her supervisor was Orlando Rodríguez, whose brother was the mayor of Mayagüez, Puerto Rico, and head of the Popular Democratic Party's ("PDP") city office. Politically, Cordero affiliates herself with the New Progressive Party ("NPP"), while Rodríguez affiliates himself with the PDP. Cordero says that on many occasions Rodríguez made disparaging comments about the NPP within her earshot.[1] She also claims that Rodríguez took many subtle steps to inconvenience her, such as repeatedly changing her

---

[1] Cordero claims she maintained a notebook with details of Rodríguez's regular harassment, but that the notebook was stolen at some point and her recollection of specific instances of harassment is hazy.

schedule and falsely claiming that she left early so he could deduct ten minutes of pay from her check.

But more important are some specific instances of misconduct Cordero describes. For example, in February 2006 Rodríguez "physically and verbally assaulted" her in an incident neither party details but that apparently resulted in Rodríguez's filing a complaint "to the Municipal Police where his brother, who is the mayor, is the chief." Then on February 23, 2007, Rodríguez approached Cordero's desk with his work-issued gun "in front of him." He said "I'm going to screw you up," and Cordero, crying, fled to a restroom. She reported the incident to "Internal Affairs, to Mr. Fabián," but nothing ever came of her report. Sometime later in 2007, Rodríguez came into Cordero's office and said that "he could give a fuck about the NPP winning" an upcoming election because his brother would still be the mayor and he could continue doing "whatever the fuck he wanted."

A serious scheduling incident also occurred in late 2007. On December 7, Rodríguez told Cordero that she had to cover a coworker's shifts from December 11-31. Then on December 19, Rodríguez issued a memo instructing Cordero to work on Sunday, December 23 in addition to covering her coworker's shift. Within the next couple days, Cordero told Rodríguez that she was sick and could not work on the 23rd or 24th. Then on December 28, Rodríguez issued another memo instructing Cordero to work on Sunday, December

30 too. Cordero claims that she never received the memo (though there is some evidence to the contrary) and thus did not show up for work that day.

At some point during all of these 2007 incidents, Cordero requested that the Department transfer her to a different office. In February 2008, Deputy Secretary of Human Resources José Fas Quiñones[2] acquiesced and transferred Cordero from the Bureau of Alcoholic Beverages and Licenses to the Bureau of Taxpayer Services, where she remained part of the Treasury Department but Rodríguez was no longer her supervisor. But even the transfer could not keep Rodríguez away from Cordero: he continued to visit her new office and harass her.

In May 2008 Cordero met with Fas and with one Fabián Serrano -- apparently a Treasury Department higher-up -- separately to complain about Rodríguez's continued harassment, but both said they could not help; the record is silent as to their reasons. Fas then sent Cordero a letter at her new office on July 3, 2008, stating that she would be suspended for thirty days because she had missed the shifts on December 23, 24, and 30, 2007 -- the ones that Rodríguez had assigned her, allegedly at the eleventh hour and without adequate notice. After internally appealing the decision, Cordero received another letter from Fas on November 5, 2008 (one

_____

[2] "Fas" is spelled at various places in the record as "Fas," "Fax," and "Faz." "Fas" is the spelling borne out by documentary evidence in the record and, accordingly, the one we'll use.

day after the NPP won a big election) stating that her suspension would proceed.

Finally, after Cordero returned from her suspension, Rodríguez approached her at her new office and again informed her that he did not care about the NPP's having won the recent general election because his brother still retained power in Mayagüez. He also added (according to Cordero) that he "would not rest until [Cordero] was permanently dismissed from the Treasury Department."

On June 26, 2009, Cordero filed a federal-court complaint asserting several federal- and local-law claims against Rodríguez, Serrano, and Fas in their personal and official capacities, and against former Treasury Secretary Angel Ortiz Garcia and current Treasury Secretary Juan Carlos Puig as well. A partially-successful motion to dismiss whittled the defendants down to Rodríguez, Serrano, and Fas in their personal capacities only, and the complaint down to political-harassment claims seeking injunctive and monetary relief under 42 U.S.C. § 1983.

After discovery, the remaining defendants filed a motion for summary judgment. They said the incidents Cordero complained of had all occurred more than a year before she filed her complaint, and they therefore argued that the action was barred by the applicable one-year statute of limitations. See Santana-Castro v. Toledo-Dávila, 579 F.3d 109, 114 (1st Cir. 2009). They also argued that, if these incidents were excluded on timeliness grounds, the

-5-

only possible adverse employment action supported by the record was Cordero's suspension for skipping work, which would have been imposed regardless of her political affiliation. Cordero responded with an objection and memorandum opposing summary judgment on the ground that incidents had still been ongoing in the year before her complaint's filing; these ongoing incidents, she argued, rendered the older incidents actionable under the continuing violation doctrine. And along with her objection, Cordero filed a sworn statement bolstering her evidence of the defendants' misconduct. The district judge refused to consider the sworn statement -- he called it self-serving and "incongruent with" her deposition testimony.[3] He nevertheless found Cordero's claim timely on continuing-violation grounds, but in the end he granted summary judgment on the merits anyway and dismissed the case, primarily on the ground that the workplace incidents Cordero described were not sufficiently severe and pervasive.

Cordero appeals the district judge's exclusion of her sworn statement and his grant of summary judgment. Because we would

---

[3] The district judge also refused to consider some of Cordero's responses to the defendants' proffered statement of material facts -- specifically those not backed up with record cites. This practice was appropriate, see CMI Capital Market Investment, Inc. v. González-Toro, 520 F.3d 58, 62 (1st Cir. 2008) (applying Puerto Rico's Local Rules 56(c) and 56(e)), and is not at issue on appeal.

affirm summary judgment even with the sworn statement as part of the record, we bypass that issue and proceed to summary judgment.

This case presents questions involving both the timeliness and the merits of Cordero's political-discrimination claim. Normally we would begin with timeliness, because if Cordero's claim is barred by the applicable statute of limitations then we have no occasion to reach the merits. But in the case of an alleged continuing violation constituting a politically-motivated hostile work environment, the question of timeliness is closely intertwined with the substance of the claim. See O'Rourke v. City of Providence, 235 F.3d 713, 732 (1st Cir. 2001). We therefore address the two issues together. And because they arise in the context of summary judgment, both the statute-of-limitations and hostile-work-environment issues receive de novo review.[4] See Rosario v. Dept. of Army, 607 F.3d 241, 246 (1st Cir. 2010) (hostile work environment); Montalvo v. Gonzalez-Amparo, 587 F.3d 43, 46 (1st Cir. 2009) (statute of limitations).

We begin our analysis with the political-discrimination framework, which finds its roots in the First Amendment's free-speech protections. To establish a prima facie case of political

---

[4] Of course, the other usual summary-judgment standards apply too: we may affirm on any grounds supported by the record, as long as there is no genuine issue of material fact and the defendants are entitled to judgment as a matter of law. Collazo v. Nicholson, 535 F.3d 41, 44 (1st Cir. 2008).

discrimination, a plaintiff must be able to show: "(1) the plaintiff and the defendant belong to opposing political affiliations; (2) the defendant has knowledge of the plaintiff's . . . affiliation; (3) . . . a challenged employment action [occurred]; and (4) . . . political affiliation was a substantial or motivating factor" behind it. Pequero-Moronta v. Santiago, 464 F.3d 29, 48 (1st Cir. 2006) (internal quotation marks omitted). If a plaintiff makes this showing, the burden shifts to the defendant to point out evidence that it would have taken the same action regardless of the plaintiff's political affiliation. Rodríguez v. Municipality of San Juan, 659 F.3d 168, 176-77 (1st Cir. 2011).

Applying this framework, Cordero says that elements one and two above are easily satisfied. She goes on to say that in deeming her complaint timely on continuing-violation grounds the court necessarily determined that she had suffered a hostile work environment, which would satisfy the third element -- an adverse employment action. See Martinez-Vélez v. Rey-Hernández, 506 F.3d 32, 42 (1st Cir. 2007). The fourth element depends on Cordero's satisfaction of the third. The defendants, too, focus on the third element and counter that their conduct was not "severe and pervasive" enough to be actionable, adding that in their view the district court got its timeliness ruling wrong.

In the political-discrimination context, "[a]ctions of informal harassment, as opposed to formal employment actions like

-8-

transfers or demotions," amounting to a hostile work environment can rise to the level of a challengeable employment action, id., but only if the discriminatory acts are "'sufficiently severe to cause reasonably hardy individuals to compromise their political beliefs and associations in favor of the prevailing party.'" Id. (quoting Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1217 (1st Cir. 1989) (en banc)). And because "hostile work environment claims do not turn on single acts but on an aggregation of hostile acts extending over a period of time," Marrero v. Goya of P.R., Inc., 304 F.3d 7, 18 (1st Cir. 2002) (internal quotation marks omitted), the applicable statute of limitations "will not exclude acts that are part of the same unlawful employment practice if at least one act falls within the time period." Dressler v. Daniel, 315 F.3d 75, 79 (1st Cir. 2003). Again, this means that our statute-of-limitations question and our substantive question are closely intertwined. See O'Rourke, 235 F.3d at 732.

To establish a hostile work environment, Cordero relies on Rodríguez's politically-charged comments, the gun incident, his rearranging Cordero's schedule to the point that she missed days and was suspended without pay,[5] and his threat to get her fired, as

---

[5] The defendants treat Cordero's thirty-day suspension as potentially being a separate ground for suit, but Cordero only says it "was part of the systematic and continuous . . . hostile work enrivonment" she was subjected to. Given Cordero's treatment of the issue, we need not consider whether the suspension would serve to meet the adverse employment action test on its own, but merely

-9-

well as his many less severe incidences of misconduct.  All these misdeeds implicate Rodríguez only.  Fas and Serrano are barely mentioned in Cordero's brief and are accused primarily of inadequate supervision (specifically, failing to take action to stop Rodríguez).  But "Section 1983 does not impose purely supervisory liability; it aims at persons who have actually abused their positions of authority, and hence only persons who were directly involved in the wrongdoing may be held liable." Martinez-Vélez, 506 F.3d at 41 (internal citation and quotation marks omitted).  This rule means Fas and Serrano prevail unless they actually did something wrong.

The record simply does not show any direct involvement between Fas or Serrano and any harassment of Cordero.  The only possible tie between either Fas or Serrano and alleged misconduct is Fas's having issued Cordero's suspension, but uncontested record evidence shows that Fas would have ordered the suspension because of Cordero's unexcused absences regardless of political opinion. Rodríguez, 659 F.3d at 176-77 (a defendant may defeat a political-discrimination claim by showing he would have taken the same action regardless of political opinion).  Because Rodríguez's misconduct does not implicate Serrano or Fas, we affirm the summary-judgment order to the extent it dismisses the claims against them.

---

bundle it into our hostile-work-environment discussion.

Against Rodríguez, though, there may be some evidence to support a hostile-work-environment claim. His day-to-day comments to Cordero do not suffice without more, but there is more: the 2006 physical altercation and 2007 gun incident, both viewed in the light most favorable to Cordero (as must be the case on summary judgment), might show that Rodríguez's misconduct was severe. And an objectively reasonable fear of physical assault and gun violence -- an inference the record here could support -- could conceivably cause even "reasonably hardy individuals to compromise their political beliefs." Martinez-Vélez, 506 F.3d at 42.

That said, the defendants argue that "any claim that plaintiff wanted to bring against defendant Rodríguez had to be brought within a year of February 6, 2008" -- the date of Cordero's transfer. The argument is not well fleshed-out, but we agree nonetheless. Here is why:

Whether or not Rodríguez's conduct prior to Cordero's February 2008 transfer was actionable, his conduct thereafter was not. Cordero's only allegations of misconduct after February 2008 are some undefined number of occasions when Rodríguez "came near [her] in an intimidating manner and stared at her fixedly" and his comment that he "would not rest" until Cordero lost her job. But Cordero says she ignored all this and that nothing else happened. These acts alone fall well short of the conduct we have found severe and pervasive in the past. See O'Rourke, 235 F.3d at 727;

-11-

<u>Tuli</u> v. <u>Brigham & Women's Hosp.</u>, 656 F.3d 33 (1st Cir. 2011). On top of that, Rodríguez was no longer her supervisor, and she was working with new people in a new department. Literally, her environment changed at that point.

Nevertheless, Cordero argues that these post-transfer events were part of the same continuing violation as the arguably actionable pre-transfer events. "The continuing violation doctrine is an equitable exception that allows an employee to seek damages for otherwise time-barred allegations if they are deemed part of an ongoing series of discriminatory acts." <u>O'Rourke</u>, 235 F.3d at 730. But although the continuing violation doctrine can render otherwise time-barred conduct actionable, the doctrine still requires some anchoring violation within the limitations period, <u>id.</u>, and we have just said that none of Rodríguez's post-transfer conduct meets that test. The continuing violation doctrine therefore does not apply here.

Cordero's transfer occurred more than a year before she filed suit, and none of Rodríguez's conduct within that one-year limitations period was actionable, so her claim against him is untimely as a matter of law. <u>See</u> <u>Santana-Castro</u>, 579 F.3d at 114. For that reason, we affirm also the district court's summary-judgment order dismissing Cordero's hostile-work-environment claim against Rodríguez.

In the end, we **affirm** the district court's grant of summary judgment dismissing Cordero's entire case.  **So ordered.**